UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.   1:11-cr-561-LO |
| | ) | |
| SYED GHULAM NABI FAI, | ) | **Sentencing Date:  March 30, 2012** |
| | ) | |
| Defendant. | ) | |

## <u>DEFENDANT'S SENTENCING MEMORANDUM</u>

Syed Ghulam Nabi Fai submits this sentencing memorandum in support of his request for a sentence of probation with a lengthy period of home or community confinement, restitution, community service and a three year period of supervised release.  The sentence requested is "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

Dr. Fai is a 62 year old American citizen who was born in the disputed region of Jammu and Kashmir, India.[1]  As set forth below, the seriousness of his offenses is substantially mitigated by the unspeakable suffering of the Kashmiri people that motivated his crimes, as well as his demonstrated remorse.  There is no need to imprison Dr. Fai to prevent him from committing further crimes, given his extraordinarily low risk of recidivism, as well as his recognition that his conduct has destroyed his credibility as an autonomous interlocutor for peace among his supporters and foes alike.

---

[1] The territory referred to as Jammu and Kashmir is disputed among China, India and Pakistan. Pakistan refers to it as Indian-occupied Kashmir.  The United Nations calls the territory Indian-administered Kashmir. The regions under the control of Pakistan are referred to as Pakistan-occupied Kashmir or PoK within India.

## I.  FACTUAL BACKGROUND

Since 1989, almost 80,000 people have been killed in Kashmir.  In 2010 there were nearly 700,000 Indian soldiers in Kashmir.  After mass, non-violent uprisings in the streets of occupied Kashmir in 1989, members of the American Kashmiri community became active in urging the U.S. government to urge implementation of the United Nations Security Council Resolutions on Kashmir and help bring peace to the disputed territory.  In 1990, Dr. Fai and others joined together to establish the Kashmiri American Council (KAC) with this same purpose.  Dr. Fai was elected by KAC's board of directors as its first (and only) Executive Director.  It has been his singular aim to bring all the parties to the conflict together, without pre-conditions, to reach a negotiated settlement.

In the early 1990s, Dr. Fai was approached by an official at the ISI with an offer to provide funding to KAC.  The initial contact was made through a Pakistani American named Zaheer Ahmad.  By accepting the funds offered by Pakistan, Dr. Fai hoped that KAC would become a financially robust organization capable of advancing the peace process in Kashmir. His approach since KAC's inception was to find a solution to the stalemate by creating a constructive atmosphere for dialogue between India, Pakistan and the Kashmiri leadership. Among other things, Dr. Fai organized international peace conferences to which he invited government officials, academics and interested parties from India, Pakistan and Kashmir. (Exhibit 1, Schedule and List of Speakers of Various International Kashmir Peace Conferences Organized by KAC).  These costly conferences produced Conference Reports written by renowned journalists (Exhibit 2, Conference Reports), as well as Conference Declarations adopted in some instances by representatives from the governments of India, Pakistan and the region of Jammu and Kashmir.  (Exhibit 3, Conference Declarations).  Dr. Fai also traveled to

over 40 countries seeking the support of government and non-governmental organizations, academics, journalists and representatives of the Kashmiri indigenous resistance seeking a solution to the Kashmir problem, consistent with the 17 United Nations Security Council and United Nations Commission for India and Pakistan (UNCIP) resolutions on the future status of Kashmir. (Exhibit 4, United Nations Resolutions).

Because he needed financial resources, Dr. Fai was willing to accept funding from any donor that was willing to contribute as long as there were no strings attached to the receipt of the funds. He knew, however, that disclosing the fact that Pakistan was funding KAC's programs and initiatives would undermine his credibility with his constituents and particularly with government of India and the indigenous Kashmiri resistance.

The United States and the defense strongly disagree about the significance of the scheme to conceal the source of funds KAC received from Pakistan. For this reason, the defense believes it is important to dispute mischaracterizations of the offense conduct such as the statement of a confidential witness in ¶ 13 of the Presentence Report that "the ISI created the KAC to propagandize on behalf of the government of Pakistan" and "the ISI has been overseeing the defendant for decades." It should first be said, however, that Dr. Fai fully admits that he engaged in the conduct set out in the Criminal Information and Statement of Facts. He readily admitted concealing his connections with Pakistan in documents filed with the Internal Revenue Service and in statements to the federal agents investigating his activities. He also admitted that he knowingly provided straw donors with letters supporting fraudulent charitable deductions they intended to claim on their personal income tax returns and is therefore responsible for $344,150 in unpaid taxes.

At the same time, Dr. Fai strenuously denies that his advocacy on behalf of Kashmir was ever influenced by the official or private positions supported by the government of Pakistan, or that he acted as an agent of Pakistan, or a mouthpiece for its agenda on Jammu and Kashmir. Rather, his role as a neutral arbiter is captured in a briefing paper he presented to President George W. Bush in June 2007:

> "We do not wish to propose a solution of the problem.  We wish that the parties work it out themselves.  But I cannot imagine any reasonable solution which will not mean some gain and some loss on all sides . . .

> "It should not be futile now to ask that Kashmir be looked at not as a dispute *between* India and Pakistan but as a problem *of* India and Pakistan together."

Among the guiding principles he offered for the negotiation process was:

> "Fourth, its object should be not to answer what is the correct or best solution of the Kashmir problem but how that solution can be arrived at.  In other words, it should by itself neither promote nor preclude any rational settlement of the dispute, be it accession or autonomy or independence or quasi-independence or condominium or some kind of joint management.  Rather than seek to impose a settlement on Kashmir, it should engage the people of each region of the form State of Jammu and Kashmir to work out a settlement themselves without any external constraint."

(See Exhibit 5, Briefing Papers for the Bush and Obama Administrations).  These views are also pervasive in Dr. Fai's speeches and writings.  (Exhibit 6, Conference Speeches of Dr. Ghulam Nabi Fai); (Exhibit 7, Articles Written by Dr. Ghulam Nabi Fai); (Exhibit 8, Papers Written by Dr. Ghulam Nabi Fai).  These principles are also reflected in the correspondence he received from government officials in the United States and abroad.  (Exhibit 9, Correspondence from Officials in the United States and Abroad).

The purpose of the scheme was always to obtain money to fund the operations of the KAC to support peace in Kashmir.  The origins of Dr. Fai's motivations are deeply rooted in his childhood:

> "Kashmir is the essence of my soul.  While now a proud American and aware that I cannot truly return to my childhood home, Kashmir is where I grew up and is, accordingly, an essential factor in who I am as a person and as an adult.  As a young boy growing up in Kashmir, my burning desire and that of my schoolmates, friends and family, was for Kashmir to be free from alien occupation."

(Exhibit 10, Fai Letter to the Honorable Liam O'Grady).  His reasons for concealing his

connections to the Pakistani ISI are also not surprising:

> "I was frightened of the disclosure that foreign monies were funding our initiatives.  If it were to become public knowledge, it would devastate my credibility."

(Exhibit 10).

Predictably, Dr. Fai has suffered the loss of his professional reputation as a result of his

arrest.

## II.      THE ADVISORY GUIDELINES RANGE

The Probation Officer has calculated a combined adjusted offense level of 21.  With a

three level reduction for acceptance of responsibility and a criminal history category I, the

resulting advisory guideline range is 27 to 33 months.  Dr. Fai believes that the appropriate total

offense level is 15 with an advisory guideline range of 18 to 24 months.   Dr. Fai submits the

following objections to the Probation Officer's guideline calculation.

### A.      Counts 1 and 2 Should Group under U.S.S.G. § 3D1.2

Dr. Fai agrees that Count 1, Element 1 (false statements) is properly analyzed under

U.S.S.G. § 2B1.1.  He also agrees that Count 1, Element 2 and Count 2 (impede, obstruct, or

defeat taxes) are properly analyzed under U.S.S.G. §§ 2T1.1(a)(1) and 2T4.1(G)).  However, he

objects to the Probation Officer's determination that they do not group.

U.S.S.G. § 3D1.2(b) - Groups of Closely Related Counts provides:

All counts involving substantially the same harm shall be grouped together into a single Group.  Counts involve substantially the same harm within the meaning of this rule:

> When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

All counts involving substantially the same harm are also grouped together into a single group under § 3D1.2(d) when:

> the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

For offenses in which there are no direct victims and society at large is the victim, Application Note 2 to § 3D1.2 defines "victims" as "the societal interest that is harmed."  In such cases, the Application Note states that "the counts are grouped together when the societal interests that are harmed are closely related."  Ambiguities in whether counts should be grouped should be resolved in accordance with the purpose of § 3D1.2, which Application Note 2 instructs is to "identify and group 'counts involving substantially the same harm.'" *Id*.

The "victim" in this case is the United States government or society at large.  Several circuits have held that where the victim appears to be the United States, as represented by an agency, the victim is defined by the governmental interest which has been violated.  See *United States v. Reyes*, 908 F.2d 281, 289 (8th Cir. 1991); *United States v. Kim*, 896 F.2d 678, 687 (2d Cir. 1990).  Here, the counts are properly grouped because they involve the same victim and the societal interests that are harmed are the same or closely related: the interests protected by enforcement of the laws governing the payment of taxes.

The counts are also properly grouped under § 3D1.2(b) because while constituting legally distinct offenses occurring at different times, Dr. Fai's conduct was connected by a common criminal objective or a common scheme or plan.  Application Note 4 to § 3D1.2 provides that:

> Subsection (b) provides that counts that are part of a single course of conduct with a single criminal objective and represent essentially one composite harm to the same victim are to be grouped together, *even if they constitute legally distinct offenses occurring at different times*.  (emphasis added).

The Fourth Circuit has decided relatively few cases interpreting § 3D1.2.  However, in *United States v. Pitts*, 176 F.3d 239, 244 (4th Cir. 1999), the court observed that:

> [t]he determination of whether or not actions constitute a single course of conduct is not necessarily an easy one for the district court to make. *See United States v. Bonner,* 85 F.3d 522, 525 (11th Cir.1996) (finding that decision is "not always clear cut" and directing sentencing courts to consider Guidelines' Introductory Commentary because existing case law provides only "some guidance"). Neither we, nor our sister circuits, have previously articulated factors appropriate for a district court to consider in making this determination. A district court, when determining whether actions constitute a single course of conduct should consider the Guidelines Commentary and the following factors . . . the duration of the defendant's conduct and whether the conduct of conviction overlaps in time, the locations in which the conduct occurs, the persons involved, the means used to accomplish the criminal purpose, and the separateness of the fear and risks of harm created by the defendant's multiple acts. No specific factor should control; the district court is to weigh them as the facts and circumstances of the individual case require.

*Id*. at 244-45.  The court further explained that:

> Whether or not offenses are connected by a common criminal objective is also a critical determination. While there are few published decisions, we are of the opinion that a defendant cannot merely define his scheme in broad fashion and argue that all of his conduct was undertaken to satisfy that broad goal. Rather, a more particularized definition of the defendant's intent is required. *See United States v. Norman,* 951 F.2d 1182, 1185 (10th Cir.1991) (rejecting government position that scheme was narrowly designed and defining defendant's purposes broadly); *United States v. Wilson,* 920 F.2d 1290, 1294 (6th Cir.1990) (same). Where the criminal conduct of the defendant constitutes ongoing behavior toward a single goal that is in fact accomplished only by the entirety of the defendant's conduct, and where the behavior is ended upon the completion of that single goal, then the district court must group the offenses. (citation omitted).  Where, however, the defendant's criminal conduct constitutes single episodes of criminal

behavior, each satisfying an individual-albeit identical-goal, then the district court
does not group the offenses. (citations omitted).

*Id*. at 245.

Pitts pled guilty to conspiracy to commit espionage and attempted espionage.  The
Fourth Circuit rejected Pitts' contention that the counts of conviction constituted a single
course of conduct with a single objective based upon "undisputed facts" that the counts
depended upon two separate time periods, involved the supplying of information to two
distinct sets of people in two separate locations, and resulted in the passage of an entirely
different category of sensitive materials involving separate and distinct instances of harm.
*Id*. at 245.

By comparison, Elements 1 and 2 of Count 1 are charged as a single continuous
conspiracy that had as its sole objective concealing the fact that money received by KAC from
the straw donors was indirectly provided by the government of Pakistan.  All of Dr. Fai's false
statements to the FBI involved the same type of information and were made for the sole purpose
of concealing the conspiracy.  The persons, and means used to accomplish the conspiracy and the
risk of harm were all the same.  In this case, the interests harmed by the conspiracy to make false
statements and to impede the payment of taxes are the societal interests protected by enforcement
of the revenue laws.  Thus, for purposes of § 3D1.2(b), Elements 1 and 2 of the conspiracy count
and Count 2  are "connected by a common criminal objective" and "constitute part of a common
scheme or plan" that resulted in one composite harm and should, therefore, be grouped.  See
*United States v. Wilson*, 98 F.3d 281, 283 (7th Cir. 1996) (when the defendant is convicted of
laundering the proceeds of his fraud in order to conceal or disguise the nature, the location, the
source, the ownership, or the control of the proceeds, "there is intuitive force to the argument

8

that the victim of the fraud is also a victim of the transaction designed to hide or "cleanse" the funds of which she was defrauded.").

This interpretation is supported by the selection of acts listed in furtherance of the conspiracy in Count 1 of the Criminal Information, specifically: (1) Fai falsely told agents of the FBI that he never met anyone affiliated with the ISI; (2) Fai falsely denied to the IRS on Form 990 tax return that KAC received money from foreign sources in 2008; (3) Fai received at least $275, 000 from officials of the government of Pakistan through Zaheer Ahmad; (4) Fai sent a letter to the Department of Justice falsely asserting that KAC was not funded by the Government of Pakistan; (5) Fai received approximately $35,000 in cash from Conspirator AA; (6) Fai falsely told FI agents that the $35,000 had been collected from Pakistanis and Kashmiris in the New York community and that he had not received cash from Conspirator A for five or six years; (7) Fai falsely denied to the IRS on Form 99 that KAC received money from foreign sources in 2009; and (8) Fai falsely denied to FBI agents that he or KAC received money from the ISI or the Government of Pakistan.  Each false statement is made to conceal the fact that KAC received money through straw donors from foreign sources – the crux of the tax charge.

U.S.S.G. § 3D1.2(b) requires grouping if two or more offenses involve the same victim and are connected by a common criminal objective or a common scheme or plan. The offenses here satisfy both of these requirements.

The false statement and tax offenses should also group under § 3D1.2(d) because the offense levels are both determined under the guidelines containing loss tables under which the offense level is determined largely on the basis of the total amount of harm or loss and because the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

**B.      A Two-Level Adjustment for Sophisticated Means Under § 2T1.1(b)(2) Is Not Warranted In This Case**

USSG § 2T1.4(b)(2) provides for a two-level increase in the base offense level of individuals who assist others to commit tax fraud where the violation involves sophisticated concealment.   For the purpose of § 2T1.1(b)(2), Application Note 4, defines "sophisticated means" as:

> Especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  Conduct such as hiding assets or transactions, or both, through use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means.

The enhancement has been held <u>not</u> to apply where a defendant evaded taxes merely by failing to report income, transferring corporate funds to a personal banker and failing to keep records of the transactions, *United States v. Hart*, 324 F.3d 575, 579-80 (3d Cir. 2003), or where a defendant directed an employee to falsify client records and block an outside accountant from accessing corporate records, *United States v. Bhagavan*, 116 F.3d 189 (7th Cir. 1997).  Even in cases where the defendant has created fictitious accounts or entities, several courts have recognized that application of the sophisticated means enhancement may not be unwarranted. See *United States v. Tin Yat Chin*, 371 F. 3d 31 (2d Cir. 2004) (dicta) (defendant's creation and use of four fictitious identities, establishment of two separate offices, and practice of accepting only cash payments would not warrant sophisticated means enhancement because scheme not especially intricate or complex); *United States v. Kraig*, 99 F.3d 1361, 1371 (6th Cir. 1996) (no sophisticated means enhancement where defendant conspired to conceal assets for third party despite fact that scheme used shell corporations and Swiss bank accounts to evade taxes); *United States v. Stokes*, 998 F.2d 279, 281-82 (5th Cir. 1973) (reversing sophisticated means

enhancement where defendant embezzled money from clinic, deposited funds into fictitious accounts, and failed to provide information as to embezzled income to accountant).

The Fourth Circuit has upheld the enhancement for tax violators in several unpublished opinions where the defendants' efforts to conceal their offenses were more complex and intricate than Dr. Fai employed in this case.  See e.g., *United States v. Boyer*, 166 F.3d 210 (4th Cir. 1998) (unpublished) (defendant instructed his attorney to hold funds in escrow until he could withdraw the funds and deposit them into his children's accounts, defendant later withdrew the money from his children's accounts to purchase a house in wife's name and moved the remaining funds into new accounts through a series of cashier checks); *United States v. Toto-Ngosso*, 407 Fed. Appx. 687, 692 (4th Cir. 2011) (unpublished) (defendant used an IRS-issued electronic filing number registered to another entity to file tax returns for his clients and used bank accounts in others' names to deposit the fees he earned as a tax preparer); *United States v. McCormick*, 208 Fed. Appx. 246, 248 (4th Cir. 2006) (unpublished) (over six-year period defendant made fraudulent entries in corporate books, opened at least 40 accounts at banks, insurance companies and brokerage houses where he deposited stolen money); *United States v. Bailey*, 216 Fed. Appx. 377, 384-85 (4th Cir. 2007) (unpublished) (defendant arranged to be paid as a consultant rather than as an employee, failed to remit his employer's payroll taxes to ensure a supply of cash to fund his salary and pay his personal expenses without generating W-2s or other documents, and then engaged in the use of nominees and utilized third-party accounts to mask his income).

By comparison, Dr. Fai's offense conduct was essentially limited to providing letters to straw donors that allowed them to take phony charitable deductions on their personal tax returns; identifying the straw donors as the source of charitable contributions on tax returns filed by KAC; and lying to conceal the fraud when confronted by the government.  Repaying the straw

donors in Pakistan made the offenses more difficult to detect, however, any other acts of concealment related solely to Dr. Fai's efforts to conceal his connection to the government of Pakistan, a fact that was not itself a crime.  The distinction is illustrated by the fact that Dr. Fai was not prosecuted for receiving cash payments from the government of Pakistan through Zaheer Ahmand because the cash payments were not reported as charitable contributions to the IRS.

Additionally, the Fifth Circuit has stated that "the guideline adjustment for the use by a defendant of sophisticated means in committing an offense provides that *the sophisticated means be tied to the offense of conviction*."  <u>United States v. Stokes</u>, 998 F.2d 279, 281-82 (5th Cir. 1993) (emphasis added).  In *Stokes*, the court found that:

> Any sophisticated means that Stokes employed to hide the money that she took from Tulane occurred in her scheme to embezzle from Tulane. It did not involve the evasion of taxes, the offense for which Stokes was convicted. There is nothing sophisticated about simply not disclosing income to your accountant. Simply put, Stokes didn't try to hide the money because she didn't want to pay her taxes. She hid it from Tulane because she didn't want Tulane to know that she had taken money from their accounts.

*Id.* at 282.

Dr. Fai pled guilty to a conspiracy to make false statements and to defraud the Department of the Treasury.  Any sophisticated means he may have employed to hide his connection to Pakistan were not tied to the offenses of conviction.  Additionally, the Probation Officer assigned a twelve-level adjustment under U.S.S.G. § 2B1.1(b)(10) for Count 1, Element 1 and Count 2 because a substantial part of the fraud was committed from outside the United States. (PSR Worksheet A).  If, as the Probation Officer found the offenses do not group, an upward adjustment for sophisticated means would result in double counting.

### III.    *UNITED STATES v. BOOKER* **AND 18 U.S.C. SECTION 3553(A) FACTORS**

The Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), now requires district courts to consider both the Sentencing Guidelines and all of the factors contained in 18 U.S.C. § 3553(a) when determining a criminal defendant's ultimate sentence.  The Supreme Court has firmly instructed that sentencing courts "may not presume that the Guidelines range is reasonable."  *Gall v. United States*, 552 U.S. 38, 49-50 (2007) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007); accord *Nelson v. United States*, 555 U.S. 350 (2009).  ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable").  Rather, a sentencing court must make an "individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50.  Above all, a court's final determination of a sentence must reflect "§ 3553(a)'s overarching instruction to 'impose a sentence sufficient, but not greater than necessary' to accomplish the sentencing goals advanced in 3553(a)(2)," namely, retribution, deterrence, incapacitation, and rehabilitation.  See *Kimbrough v. United States*, 552 U.S. 85, 111 (2007).

*Rita* made clear, and *Kimbrough* affirmed, that in making these individual assessments, sentencing courts are free to disagree with the guidelines' recommended sentence in any particular case, and may impose a different sentence based on a contrary view of what is appropriate under § 3553(a).  This includes the freedom to disagree with "policy decisions" of Congress or the Sentencing Commission that are contained in the guidelines.  As the Supreme Court noted, "[a]s far as the law is concerned, the judge could disregard the Guidelines . . ." *Rita*, 551 U.S. at 353.  As the Court put it in *Rita*,

> The upshot is that sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic 3553(a) objectives.

*Id*. at 348.

13

In *Kimbrough*, moreover, the Supreme Court effectively acknowledged that not all guidelines are equal. While some "exemplify the Commission's exercise of its characteristic institutional role," others to not. *Kimbrough*, 552 U.S. at 109. Such is the case with the tax loss table in U.S.S.G. § 2T4.1 because the Commission did not take account of empirical data and national experience.

Most recently in *Pepper v. United States*, __ U.S. __, 131 S. Ct. 1229, 1239-40, 179 L. Ed. 2d 196 (2011), the Supreme Court emphasized its post-*Booker* opinions make clear that although a sentencing court must "give respectful consideration to the Guidelines, *Booker* permits the court to tailor the sentence in light of other statutory concerns as well." *Id*. at 1241.

> "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Williams*, 337 U.S., at 247, 69 S.Ct. 1079; see also *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55, 58 S.Ct. 59, 82 L.Ed. 43 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender"). … In particular, we have emphasized that "[h]ighly relevant-if not essential-to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Id*., at 247, 69 S.Ct. 1079. Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant." *Wasman v. United States*, 468 U.S. 559, 564, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984).

*Id*. at 1239-40. The Court also made clear its position that:

> [b]oth Congress and the Sentencing Commission thus expressly preserved the traditional discretion of sentencing courts to "conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come." *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972).

*Id*. at 1240-41.

Thus, this Court must begin its analysis by correctly calculating the advisory sentencing range, but it is then free, in light of the other statutory sentencing factors, to impose an entirely different sentence - one which is "sufficient, but not greater than necessary to comply with" the statutory goals of sentencing. *See Rita,* 551 U.S. at 350-51.

## IV. A SENTENCE OF PROBATION WITH A LENGTHY TERM OF HOME DETENTION OR COMMUNITY CONFINEMENT, RESTITUTION, COMMUNITY SERVICE, AND THREE YEARS OF SUPERVISED RELEASE WOULD BEST SATISFY THE GOALS OF § 3553(a)

The Court must impose a sentence "sufficient, but not greater than necessary," to comply with the purposes set forth in § 3553(a) which are "the need for the sentence imposed –

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2). In "determining the particular sentence to be imposed," the Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 355(a)(1)-(7).

Like the fraud guideline which focuses primarily on aggregate monetary loss and victimization, the tax guideline fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case." See Alan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses,* 25 Crim. Just. 34, 37 (2011); *see also United States v. Ovid,* slip op., 2010 WL 3940724, *1 (E.D.N.Y.

Oct. 1, 2010) ("[T]he fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could eve do so.").  A substantial variance is needed in this case because the mitigating factors which are highly relevant to the purposes of sentencing are not taken into account by the applicable advisory guideline range.

### A.     The History and Characteristics of the Defendant

Dr. Fai's history and characteristics are best described in his letter to the Court, (Exhibit 10), and in the myriad letters written on his behalf.  (Exhibit 11).  A small sampling from those letters follow:

> "Because of our relationship, I know Dr. Fai's story rather intimately.  I know how, as a young man, he traveled to Saudi Arabia and single-handedly persuaded one of the leading figures of Islam, the Imam of Makkah, to travel to Kashmir and speak at a conference, and how that blossomed into a major acknowledgment and movement which brought into broad daylight a sincere desire for independence throughout the country.  It also led to his being targeted by the Indian government, which had made it a crime punishable by death to speak of independence in Kashmir.  This has not only been a threat to his life but has prevented his return to his homeland ever since . . .

> "He is a hero to his people.  Thousands demonstrated in the streets of Srinagar and throughout Kashmir when he was arrested.  Dr. Fai offered them hope.  He gave them something to believe in besides death squads and gang rapes by an out-of-control military. Kashmir will suffer even more greatly if he cannot return to his work, because at the moment I know of no one else who could ever fill his shoes.  He has been the principle voice in the U.S. for his people.  I pray that he be allowed to continue."

*Written by Paul Barrow, Director of Policy and Communications, United Progressives Inc.*

> "Since first hearing about Dr. Fai's legal troubles, I have thought a lot about this humble, sincere, and faithful man who I have known for so long.  While I do not know all of the details of what occurred I have read the press release from The FBI's Office of Public Affairs dated December 7, 2011.  This has been a shocking and heart breaking time for his friends and supporters.  His admission of guilt seems so out of character for a man who has been such an ardent advocate for truth and justice.  While he has obviously made serious mistakes while at KAC, I know he is remorseful and repentant. Dr. Fai let his passion for his cause supersede his judgment."

*Written by Mushtaq A. Bukhari, M.D.*

"Dr. Fai was himself a victim of the Indian Government's inhumane polices in the occupied Kashmir.  He was not able to visit his parents and family living in Kashmir since his departure from that part of world several decades ago.  In America, he became the globally recognized face of the plight of Kashmiri people.

"He presented the Kashmiri case in 17 sessions of the United Nations Human Rights Council in Geneva from 2006 until June 2011.  He participated in all summits of the Organization of the Islamic Conference (OIC) since 1991, and met with over 50 Heads of State over the last 20 years.  He addressed the preliminary session at the Centennial Conference of the Parliament of the World's Religions, held in Chicago in August 1993.  Dr. Fai also organized ten International Kashmir Peace Conferences at the Capitol Hill, Washington, D.C."

*Written by Zahid H. Bukhari, Ph.D., President, Islamic Circle of North America (INCA)*

"Dr. Fai is a man of peace.  Never has he advocated violence, despite brutal repression on an innocent population, and militant opposition to Indian rule.  Rather, he has pursued peaceful initiatives at every avenue, lecturing on numerous "out of the box" steps that would ultimately lead to a resolution.  As Executive Director of the KAC, Dr. Fai has written numerous pieces on the Kashmir conflict.  They include book chapters, articles, Op-Ed pieces and essays.  Each are uniformly absent of any call to arms.  Rather – it has always been his position that Kashmir is a political solution that could only be solved peacefully.  His role in a temporary cease-fire between indigenous Kashmiri militants and Indian forces is only too well known.  His goal of a permanent cease fire on the ground in Kashmir was unachievable due to Indian government intransigence in refusing to declare only the disputed nature of Kashmir.

"Dr. Fai has been a "go to" man on Kashmir as far as the U.S. Government was concerned.  In regular contact with the State Department, the National Security Council and others, his sincerity in advocating for his people was matched only by his seemingly endless energy in taking the cause of Kashmir to every unopened doorway.  Always supporting confidence building measures between India and Pakistan, Dr. Fai interacted with all branches of government offering support for the processes, while continuing to advocate that these steps not be considered an end in themselves.  In sum – Dr. Fai is a man who has willingly sacrificed himself for the good of his nation and people."

*Written by Sareer A. Fazili, Esquire, Board of Directors, Kashmiri-American Council*

"As far as I am concerned Dr. Fai has worked hard and effectively in pursing the rights of the people of Kashmir, which were abandoned when the United Nations allowed the Security Council's Resolution of April 21, 1948, providing for a plebiscite to be held on

self-determination in the original princely State of Jammu and Kashmir, to be rendered inoperative. He was a valued colleague with whom I enjoyed working, and I was astonished to learn that he is being charged with an offence of dishonesty."

*Written by Lord Eric Avebury, British House of Lords*


"Dr. Fai's contribution in the Kashmir discourse has been unique and for many, a subject of great learning. He is distinct for his original thinking. He displays a fiercely independent approach in his treatment of the contemporary issues, particularly Kashmir. He is staunchly committed to the ideal of conflict transformation in Kashmir, in a manner that unknots the issue in keeping with two ingredients: establish primacy of the Kashmiri people and concurrently, to satisfy the legitimate interests of both India and Pakistan. In fact, this prescription is very much central to my current research undertaking on Jammu-Kashmir."

*Written by Ambassador (R) Arif Kamal, Pakistan*

"Dr. Fai took upon himself the stupendous task of making the US government, the UN Human Rights Commission and other organization aware about the suffering of people of Jammu and Kashmir State. Knowing him very intimately he in true sense is a man for peace, committed to the resolution of the Kashmir dispute through peaceful negotiations between India, Pakistan and people of Jammu and Kashmir. To achieve this objective he has been strenuously working for over past two decades by organizing all inclusive international peace conference in the Capital hill. These peace conferences have enable India and Pakistan opinion makers, think tanks and intellectuals to sit around one table to narrow down their differences even during bitterest relations between Islamabad and New Delhi. The Conference organized by KAC had to a great extent helped in building bridge between two distant neighbors and creating an atmosphere for creating trust between two South Asian nuclear Powers."

*Written by Mirwaiz Umar Farooq, Chairman, All Parties Hurriyat Conference*


"Dr. Fai has publicly expressed the shame and deep regret for his actions both to our judicial system and at allowing himself to have compromised our organization and the purpose of the whole Kashmiri freedom movement."

*Written by M. Yousuf Fazili, M.D., Board of Directors, Kashmiri American Council*


"Having carried out a heroic struggle under most difficult circumstances, Dr. Fai has become the globally-recognized face of Kashmiri public diplomacy.

"It also explains his failure to observe the US laws.  Throughout human history, in order to preserve the human dignity of their people, even leaders as great as a Nelson Mandela could not help overstepping legal boundaries.

"It is my firmest conviction that Dr. Fai's contravention of the US laws had resulted from his eagerness to find a way to help his people, and not form any desire to cheat the IRS from its due share of taxes."

*Written by Agha Saeed, Ph.D.*

"What Dr. Fai has done for the cause of freedom in general, and for the freedom struggle in Kashmir in particular, can never be compensated in kind.  He has been an untiring crusader for peace, brotherhood, justice, and harmony among various faith communities in Kashmir, as well as in America.  For this, he, his wife, and his children have contributed what none of his friends and well-wishers, including myself, could never match.  I wish I had the wherewithal to put in even 0.1% of his contributions.

"Over the decades, Dr. Fai has frequented institutions and international platforms all across the world, spreading the message of the occupied people of Kashmir.  This, at the cost of being away from his family so often, while his other comrades, myself included, continued the unhindered pursuit of our professions, and the unperturbed company of our family.

"While I understand that there is no excuse for breaking the law, I firmly believe that Dr. Fai's offenses were dictated by the sheer nature and the sensitivity of his mission, not motivated by any personal greed or advancement."

*Written by Dr. Tariq Shah*

"For last several decades, people of our state have been closely watching activities of Dr. Fai in United States.  The organization which he is heading had made its name internationally and has done commendable work in helping the Governments of India and Pakistan in resolving, what is called, Kashmir dispute.  The speeches delivered by Dr. Fai in many conferences, seminars, meetings, were extensively reported in the print media.  It is the general consensus of the civil society that Dr. Fai has always strongly and forcefully pleaded for peace in the subcontinent and good relationship between the two countries of India and Pakistan.  I am sure that history will record Dr. Fai as a peace broker."

*Written by Zaffar A. Shah, Sr. Advocate, Jammu & Kashmir High Court*

"His commitment to the Kashmiri cause has been the main goal of Dr. Fai's life: indeed, it has consumed him at the cost of his personal comfort and pleasure.  Despite

his passion for the cause, I have never noticed him to speak unkindly, impolitely or bitterly against those who may be his personal or political adversaries."

*Written by Ghulam N. Mir, M.D.*

### B.      Need for Just Punishment in Light of the Seriousness of the Offense

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements:  the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity."  Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment:  "Proportionality" Relative to What?*, 89 Minn L. Rev. 571, 590 (February 2005).  The guidelines include none of the factors bearing on Dr. Fais degree of culpability.

### 1.      Dr. Fai Was Not Motivated by Greed

A defendant's motive is highly relevant at sentencing.  *See Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993); *United States v. Mahan*, 2007 WL 1430288, at *3 (10th Cir. 2007) (sentence was procedurally unreasonable where district court refused to consider defendant's stated motive for possession unloaded shotgun, *i.e.,* that he has been violently beaten by three men and sought to defend his wife); *United States v. Milne*, 384 F.Supp. 2d 1309, 1310-11 (E.D. Wis. 2005) (granting variance where "defendant did not take the bank's money out of greed or a desire to live a lavish lifestyle, [but in effort] to keep a sinking business afloat"); *United States v. Ranum*, 353 F.Supp. 2d 984, 990 (E.D. Wis. 2005) (defendant did "not act for personal gain or for improper personal gain of another").

Dr. Fai began by receiving funds from Pakistan in cash for which tax deductions were never claimed.  In order to avoid having to identify the source of large deposits, Dr. Fai later asked Zaheer Ahmad to arrange for the funds to be paid to KAC by check.  He did not set out to defraud the Internal Revenue Service, however, he felt compelled to fund KAC's operations at a level capable of advancing the peace process in Kashmir.

This case is readily distinguishable from a case in which a defendant misappropriates money to support a lavish lifestyle.  Dr. Fai's motive was to stop the killing and disappearance of tens of thousands of Kashmiris and was born of his resolute dedication to the cause of Kashmir.

> **2.     The Seriousness of the Offense Has Been Partially Mitigated by the Government's Seizure Of $142,851.32 and the More Than 20 Hours He Has Spent in Debriefings Providing Information to the Government**

Dr. Fai has agreed to forfeit all his interest in $126,508.76 seized from his personal retirement accounts, $8,908.00 in cash seized during the execution of a search warrant for his home, and $7,434.56 seized from accounts in the name of the Kashmiri American Council.  The forfeiture is in addition to agreeing to pay restitution in the full amount of the losses incurred by the IRS ($344,150) reduced by the amounts of any payments to the IRS by any of the straw donors.  He has also responded to questioning by as many as five government during seven debriefing session, each lasting at least three hours.  The United States has informed defense counsel that it does not intent to file a motion for downward departure based upon Dr. Fai's substantial assistance to the government.

### C.     Need for Deterrence

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."  Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime &

Just. 1, 28 (2006).  "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."  *Id.*,; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm:  Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").  Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University.  *See* Andrew von Hirsch *et al., Criminal Deterrence and Sentence Severity:  An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF.  The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries.  *Id.* at 1.  It examined the effects of changes to both the certainty and severity of punishment.  *Id.*  While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significant."  *Id.* at 2.  The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects."  *Id.* at 1.  Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment.  *See* David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes,* 33 Criminology 587 (1995); *see also* Gabbay, *supra,* at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

**D.      Need for Incapacitation**

Dr. Fai has an exceptionally low risk of recidivism.  He is 62 years old, a first offender,

holds a post graduate degree, was employed throughout his adult life, has been married for

twenty four years, and has no history of drug or alcohol abuse.  For all male offenders in

Criminal History Category I, the recidivism rate is 15.2%.  For those over age 50 at the time of

sentencing, however, the rate in Category I is only 6.2%.  For those who are college graduates,

the rate in CHC I is just 7.1%; for those who have been employed, the rate is 12.7%; and for

those who were ever married, the rate is 9.8%.  For those with no history of illicit drug use, the

recidivism rate is half that of those who do have a drug history.  Undoubtedly, for those like Dr.

Fai who are educated, have been employed, been married, are drug free and over 50, the

combined rate is even lower.  *See* U.S. Sent'g Comm'n, *Measuring Recidivism:  The Criminal

History Computation of the Federal Sentencing Guidelines*, at Exh. 9, at 28; Exh. 10, at 29 (May

2004) [hereinafter *Measuring Recidivism*].  For all Category I defendants convicted of fraud, the

recidivism rate is just 9.3%, the lowest of any offense category, which is 45% below the rate for

all fraud offenders.  *Id.,* Exh. 11, at 30.  Finally, offenders like Dr. Fai with zero criminal history

points have a rate of recidivism half that offenders with one criminal history point.  *See* Sent'g

Comm'n, *Recidivism and the "First Offender,"* at 13-14 (May 2004) [hereinafter *First

Offender*].

The Commission has recognized the advisability of revising the guidelines to take age

and first offender status into account.  *See First Offender* at 1-2 (identifying goal of "refin[ing] a

workable 'first-offender' concept within the guideline criminal history structure"); *Measuring

Recidivism* at 16 (noting that "[o]ffender age is a pertinent characteristic" that would "improve

[the] predictive power of the guidelines "if incorporated into the criminal history computation").

23

The Commission has not implemented any such revisions to the criminal history guidelines, but has recently stated that age and physical conditions relating to age "may be relevant" in granting a departure.  USSG § 5H1.1, Policy Statement.  At 62, Dr. Fai suffered a brain aneurism in 2007, has twice had kidney stones and has experienced medical issues with his heart.

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Dr. Fai, this Court should consider the statistically low risk of recidivism presented by his history and characteristics.  *See, e.g., United States v. Darway,* 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Hamilton,* 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age, which made it unlikely that he would again be involved in a violent crime); *United States v. Ubina,* slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F.Supp.2d 271, 279 (D. Mass. 208) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"); *Simon v. United States,* 361 F.Supp.2d 35, 48 (E.D.N.Y.205) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum*, 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57 year old defendant because recidivism drops with age); *United States v. Ward*, 814 F.Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense).

### E.      Need to Avoid Unwarranted Disparities and Unwarranted Similarities

The Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct.  18 U.S.C. § 3553(a)(6).

In fiscal year 2010, sentences below the guideline range were imposed in 60% of all tax cases.  *See* U.S. Sent'g Comm'n, *Sourcebook of Federal Sentencing Statistics*, FY 2010, tbl. 31A (Exhibit 12).  Downward departures under *Booker* and 18 U.S.C. § 3553(a) were imposed in 81.9% of all tax cases, with a median sentencing of 5 months.  *Id.* at tbl. 31B.  (Exhibit 13).  These sentences exemplify the trend in tax cases across the country.

### F.      Kinds of Sentences Available

This Court must also consider all of "the kinds of sentences available" by statute, even if the "kinds of sentence . . . established [by] the guidelines" zones recommend only a lengthy prison term.  See *Gall*, 552 U.S. at 59-60 & n. 11.

Congress has directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."  28 U.S.C. § 994(j).  Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service."  *See* Pub. L. No. 98-473, § 239, 98 Sat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note).

25

A sentence of probation with a lengthy period of home detention or community confinement, restitution, community service and a three year period of supervised release in this case would serve Congress' stated purpose.

## V.   THE GUIDELINE RANGE PROVIDES NO USEFUL ADVICE BECAUSE IT IS NOT BASED ON EMPIRICAL EVIDENCE OR NATIONAL EXPERIENCE, AND FAILS TO PROMOTE ANY PURPOSE OF SENTENCING

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that "assure the meeting of the purposes of sentencing," 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-guidelines period as a "starting point." 28 U.S.C. § 994(m). The Commission was then to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system. *See* U.S.C. § 991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), (16). The original Commissioners abandoned the effort to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead purportedly developed the guidelines based on an empirical study of time served for various offenses before the guidelines. *See* USSG, Ch. 1 Pt. A(3); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest,* 17 Hofstra L. Rev. 1, 7 9188).

In *Rita v. United States,* 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be "fair to assume" that the guidelines "reflect a rough approximation" of sentences that "might achieve § 3553(a)'s objectives." First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Commission can review and revise the

guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Id.* at 348-50.

The Court recognized, however, that not all guidelines were developed in this manner. See *Gall v. United States,* 552 U.S. 38, 46 & n.2 (2007); *Kimbrough v. United States,* 552 U.S. 85, 96 (2007). When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id.* at 109-10.

The tax loss guideline is not based on empirical data of past practice or on the national experience since then. Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2T4.1, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Pepper v. United States,* __S.Ct.__, 2001 WL 709543, *13 (Mar. 2, 2011); *Spears v. United States,* 129 S.Ct. 840, 843 (2009); *Kimbrough*, 552 U.S. 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

### A.   Dr. Fai's Advisory Guideline Range is 230% of the Average Past Practice Sentence and 160% of the Original Guideline Range

Dr. Fai's guideline range based on the tax loss table is 27-33 months. Before the guidelines, first offenders convicted of tax offenses involving loss amounts of $100,000-$400,000 who were sentenced to prison, served on average, 10-16 months and 22% of such defendants received probation. *See* U.S. Sent'g Comm'n, *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements 34* (1987), http://www.src-project.org/wp-content/pdfs/reports/USSC_Supplementary %20Report.pdf  First offenders convicted of sophisticated fraud involving the highest loss amounts who were sentenced to prison served, on

27

average, a prison sentence of 18-24 months and 18% of such defendants received probation.  *Id.*
at 33.  Under the original guidelines, the offense level for tax losses between $300,000-$500,001
was level 14.  *See* USSG § 2T4.1 (1987).  In 1987, the guideline range for offense level 14 was
15-21 months.  *See* USSG § Chapt. 5, Part A, Sentencing Table.

When the Commission adopted the original guidelines in 1987, it "decided to abandon
the touchstone of prior past practice" with respect to white collar offenses.  Breyer, *supra*, 17
Hofstra L. Rev. at 22-23.  The Commission required some form of confinement for all but the
least serious cases, and adopted a tax guideline requiring no less than 0-6 months and no more
than 30-37 months for defendants in Criminal History Category I.  *See* USSG § 2T4.1 (1987).
The Commission explained that "the definite prospect of prison, though the term is short, will act
as a significant deterrent to many of these crimes, particularly when compared with the status
quo where probation, not prison, is the norm."  USSG, ch. 1, intro., pt. 4(d) (1987); *see also* U.S.
Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the
Federal Criminal Justice System is Achieving the Goals of Sentencing Reform 56* (2004)
[hereinafter *Fifteen Year Report*] (Commission sought to ensure that white collar offenders faced
"short but definite period[s] of confinement").

The Commission's deterrence rationale was not based on empirical evidence.  The
empirical research regarding white collar offenders shows no difference between the deterrent
effect of probation and that of imprisonment.  *See* David Weisburd *et al., Specific Deterrence in
a Sample of Offenders Convicted of White Collar Crimes,* 33 Criminology 587 (1995).  "[T]here
is no decisive evidence to support the conclusion that harsh sentences actually have a general and
specific deterrent effect on potential white-collar offenders."  Zvi D. Gabbay, *Exploring the*

28

*Limits of the Restorative Justice Paradigm:  Restorative Justice and White Collar Crime*, 8

Cardozo J. Conflict Resol. 421, 448-49 (2007).

Moreover, the Commission quickly abandoned its original goal of ensuring "short but

definite" sentences.  Beginning just two years after the Guidelines went into effect, prison

sentences for tax offenses were periodically increased.  The effect of those increases on this case

was by 2003, to increase the base offense level by four more levels for losses between $300,001

and $500,000.  As a result, Dr. Fai's advisory guideline range is 12 months higher than the range

under the original 1987 guideline, increased as follows:

> **1987**
>
> 2T1.9   Offense level determined from 2T4.1
> 2T4.1   Amount of loss between $300,001-500,000          level 14
> Guideline Range                                          15-21 months
>
> **2003**
>
> 2T1.9   Offense level determined from 2T4.1
> 2T4.1   Amount of loss between $200,000-400,000          level 18
> Guideline Range                                          27-33 months

**B.      Four Levels Were Added for the Amount of Tax Loss Without Basis in Empirical Data or National Experience and Without Any Demonstrated Need to Further Any Purpose of Sentencing**

As the official reason for the 2003 amendment, the Commission stated that "it continues

its work to deter and punish economic and white collar crimes, building on its Economics Crime

Package of 2001.  USSG, App. C, Amend 653 (Nov. 1, 2003).  The Commission also stated that

the amendment implements directives in the Sarbanes-Oxley Act of 2002 by making

modifications to 2T4.1 (Tax Table).  *Id.*

At the Commission's Economic Crimes Symposium in 2000, at which the issues and

questions underlying the Economic Crimes Package were discussed, a formal question was

posed in writing:  "[I]f there is a current problem with the guidelines that is in need of repair, is it that fraud and theft are punished too leniently or that drug crimes are punished too harshly?" U.S. Sent'g Comm'n, *Symposium on Federal Sentencing Policy for Economic Crimes and New Technology Offenses* 54 (2000) [hereinafter *Economic Crimes Symposium*].[2]

Speaking on behalf of the Department of Justice Assistant Attorney General James K. Robinson stated that "sentences for economic crimes should not be set, in our view, to match sentences for drug crimes," *Id.* at 59, but should be set "in terms of the need to fulfill the purposes of sentencing," *Id.* at 58.  Judge J. Phil Gilbert, speaking on behalf of the Criminal Law Committee of the Judicial Conference, stated that drug crimes are "punished too harshly," high loss fraud offenses are punished "too leniently," and they cannot be compared because they are "apples and oranges."  *Id.* at 56.  Dr. Mark Cohen, Professor of Economics at Vanderbilt University, stated that "drug offenses are broke so they need to be fixed," but that there was no "evidence that fraud is broke," and summarized research presented at the symposium demonstrating that increasing sentences for fraud would not serve the purpose of deterrence.  *Id.* at 65-66, 69.

### C.  The Base Offense Level for Tax Offenses Was Increased in Response to Political Pressure and Against the Commission's Better Judgment

The Sarbanes-Oxley Act had raised statutory maximums for most fraud offenses after a "bidding war" in Congress.  *See* Frank O. Bowman, III, *Pour Encourager Les Autres?*, 1 Ohio State J. Crim. L. 373, 404 (2004).

As its stated reason, the Commission pointed to Congress' directive in section 905(b)(2) of the Sarbanes-Oxley Act, Pub. L. No. 107-204, which instructed it to consider whether the

---

[2] http://www.ussc.gov/Research/Research_Projects/Ecomonic_Crimes/20001012_Symposium/ePlenaryIII.PDF.

guidelines are "sufficient to deter and punish" certain economic crimes "in view of the statutory increases in penalties contained in the Act" *See* USSG App. C, Amend. 653 (Nov. 1, 2003) (Reason for Amendment). The Department of Justice placed intense pressure on the Commission to raise sentences for all fraud offenders, privately threatening to go back to Congress for a more specific directive if the Commission did not comply with the Department's wishes. The Commission initially resisted. However, nine months after the Sarbanes-Oxley Act was enacted, one Senator unilaterally inserted into the congressional record a "legislative history" stating that Congress meant the Commission to raise sentences for both high and low-level fraud offenders, with special attention to the "penalty gap" between fraud and narcotics cases. See Bowman, *supra*, at 411-32.

The Commission simultaneously raised the offense levels in the tax table for losses over $200,000 from 13 to 18 "to maintain the longstanding proportional relationship between the loss table in § 2B1.1 and the tax loss table." *See* U.S. Sent'g Comm'n, *Report to Congress, Increased Penalties Under the Sarbanes-Oxley Act of 2002"* Jan. 2003. (Reason for Amendment). In doing so, the Commission once again ratcheted up the tax guideline to more closely match the unsound drug guidelines, thus abdicating to Congress its independent judgment regarding the seriousness of the offense. See Bowman, *supra*, at 434.

> **D.    Widespread Disagreement with the Tax Guidelines is Further Evidence that is Unsound**

In fiscal year 2010, downward departures from the guideline range were imposed in 60% of all tax cases. *See* U.S. Sent'g Comm'n, *Sourcebook of Federal Sentencing Statistics,* FY 2010, tbl. 31A. (Exhibit 12). Downward departures under *Booker* and 18 U.S.C. § 3553(a) were imposed in 81.9% of all tax cases, with a median sentence of 5 months. *Id.* at tbl. 31B. (Exhibit 13). This near unanimity suggests that the judiciary sees a consistent disjunction between the

31

sentences prescribed by the Guidelines for cases like the defendant's and the fundamental requirement of Section 3553(a) that judges imposes sentences 'sufficient, but not greater than necessary' to comply with its objectives."  Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent. R. 167, 169, 2008 WL 2201039, at *4 (Feb. 2008).

A variance is necessary in this case meet the purposes of sentencing.  As the Supreme Court emphasized, when judges articulate reasons for sentences outside the guideline range, they provide "relevant information to both the court of appeals and ultimately the Sentencing Commission," which "should help the Guidelines constructively evolve over time, as both Congress and the Commission foresaw."  *Rita*, 551 U.S. at 357-58.

## VI.    CONCLUSION

For the foregoing reasons, Mr. Fai respectfully submits that a sentence of probation with a lengthy period of home detention or community confinement, restitution, community service and a three year period of supervised release is sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

Respectfully submitted,

SYED GHULAM NABI FAI
By Counsel

/s/ _____
Nina J. Ginsberg, Esquire
VSB # 19472
Attorney for Defendant
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA  22314
703-684-4333
703-548-3181 (Fax)
nginsberg@dimuro.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of March, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record.

I also certify that a true and accurate copy was sent by email to Nina Blanchard, U.S. Probation Officer at nina_blanchard@vaep.uscourts.gov.

/s/_____
Nina J. Ginsberg, Esquire
VSB No. 19472
Counsel for Defendant
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA 22314
703-684-4333
703-548-3181 (Fax)
nginsberg@dimuro.com

33